**Opinion filed May 3, 2012**



In The

# Eleventh Court of Appeals

_____

## No. 11-10-00135-CR
_____

## GABRIEL MEJIA PINA, Appellant

## V.

## STATE OF TEXAS, Appellee

---

**On Appeal from the 90th District Court**

**Stephens County, Texas**

**Trial Court Cause No. F32094**

---

## M E M O R A N D U M   O P I N I O N

The jury convicted Gabriel Mejia Pina of intoxication manslaughter. *See* TEX. PENAL CODE ANN. § 49.08(a) (West 2011). The jury also found that appellant used his motor vehicle as a deadly weapon in the commission of the offense. *See* TEX. PENAL CODE ANN. § 1.07(a)(17)(B) (West Supp. 2011). The trial court assessed punishment at confinement in the Institutional Division of the Texas Department of Criminal Justice for a term of fifteen years and a fine of $5,000. Appellant filed a motion for new trial, which the trial court denied. The trial court certified appellant's right to appeal, and this appeal ensued. We affirm.

Appellant challenges the sufficiency of the evidence in four issues. First, appellant argues that the evidence was factually insufficient to support his conviction because there was insufficient evidence of intoxication at the time of the accident. Second, appellant contends that the evidence was legally insufficient because there was insufficient evidence of a causal connection between appellant's intoxication, if he was intoxicated, and the fatal result. In his third and fourth issues, appellant asserts that the evidence was factually and legally insufficient to support a finding that he drove his car in such a way that in the manner of its use, or intended use, the vehicle constituted a deadly weapon.

We review a sufficiency of the evidence issue, regardless of whether it is denominated as a legal or as a factual sufficiency claim, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we examine all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and any reasonable inferences from it, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

A person commits the offense of intoxication manslaughter if the person operates a motor vehicle in a public place while intoxicated and, by reason of that intoxication, causes the death of another by accident or mistake. Section 49.08(a). A person is intoxicated if the person does not have the normal use of mental or physical faculties by reason of the introduction of alcohol into the body or if the person has an alcohol concentration of 0.08 or more. *Id.* § 49.01(2).

The evidence showed that, on June 20, 2008, at approximately 4:30 p.m., appellant was involved in a motor vehicle crash that resulted in the death of his right rear passenger, Angel Silva. The accident occurred at Highway 180 and FM 3099 in Breckenridge and involved appellant's blue Kia and a white, one-ton Dodge Ram driven by Stephen McCullough. The blue Kia sustained the most damage, and the damage to the passenger side was extremely heavy.

Appellant testified that, on the morning of June 20, he went to pick up his friend, Armando Silva Jr., so that he could tattoo Armando's arm. Appellant and Armando were very close, like family. After appellant picked up Armando, they went to CVS to get gloves and then went to Bill's Conoco to get a twelve-pack of Bud Light. Appellant returned to his home with Armando between 10:30 and 11:00 a.m. He ate rice and beans and then began setting up his

2

tattoo equipment. After he finished setting up the equipment, appellant sketched out the tattoo and then consumed a beer. Appellant shaved Armando's arm, transferred the sketch of the tattoo to Armando's skin, and began working on the tattoo. The tattoo took three to three and one-half hours to complete. During that time, appellant "probably had two more beers."

Angel Silva, Armando's younger brother, arrived at appellant's house during the tattoo process. At approximately 3:30 p.m., appellant, Armando, and Angel left appellant's house and went to Armando's house to pick up fishing poles. From Armando's house, they went to another friend's house to see if he wanted to go fishing with them. Their friend was not at home, and they drove around town for a while and then stopped at the L&L restaurant to see if some of their other friends wanted to go fishing. They left L&L, went to the Movie Gallery, and then headed to Skinny's convenience store to get ice. Appellant was driving, Armando was in the front passenger seat, and Angel was in the right rear passenger seat.

As appellant approached Skinny's, he merged into the turning lane, came to a complete stop, checked his field of view, and then turned left to go into the Skinny's parking lot. Appellant testified that they were listening to music but were not carrying on a conversation. Appellant saw a pickup coming before he turned, but he thought that the pickup was at a fair distance and that it was safe for him to cross. The pickup hit appellant's car, and the car started spinning. When the car stopped spinning, Armando was pushed up against appellant and asking him for help. Appellant unfastened Armando's seat belt, and Armando crawled out of the car through the window because the door was completely destroyed. Appellant saw Angel leaning over to the right and knew that he was hurt, but appellant did not know to what degree he was hurt. Appellant was able to remove his seat belt but could not get out of the car because his door was stuck. Emergency personnel removed appellant from the car and transported him to the hospital.

Appellant testified that he did not fail to yield the right-of-way and that he had the right-of-way because it was clear to go. He did not cause the death of his friend, Angel, and believed that the cause of death was the severity of the impact.

Armando Silva Jr. testified that he went to appellant's house to get a tattoo. At approximately 10:00 a.m., appellant picked him up. They went to the store to get latex gloves and a twelve-pack of Bud Light bottles and then went to appellant's house. It took about three and one-half hours for appellant to complete the tattoo. Appellant had three to four beers during

this time. When the tattoo was completed, Armando wanted to go fishing. He and appellant left appellant's house and went back to Armando's house to get fishing poles. Angel, Armando's little brother, left Armando's house with Armando and appellant. Appellant, Armando, and Angel stopped at an Easy Mart to pick up some more beer. They forgot to get ice so they decided to stop at Skinny's. Armando testified that they got in the turning lane, stopped, and then turned to go into Skinny's. When they began turning, Armando saw a pickup coming at them that looked like it was flying. He thought the pickup was coming fast and knew it was going to hit them. Armando testified that he did not blame appellant for the accident, nor did he believe that appellant did anything to cause Angel's death. On cross-examination, Armando was asked if he told the people in the ambulance that he did not remember what happened. He did not deny making that statement to ambulance personnel.

Stephen McCullough testified that he was in his company pickup heading eastbound on Highway 180 on his way home from work when a car "came from the left out" in front of him. McCullough was traveling in the left inside lane at approximately fifty miles per hour when the accident occurred. He believed that the car was coming from FM 3099. He did not remember whether he applied his brakes when he saw the car; however, there were skid marks from his pickup indicating that he did apply his brakes before impact. McCullough noticed that the passenger of the car had his arm lying on the door where the window goes up and down. When he hit the car, his pickup spun around so that, when he stopped, he was facing westbound on Highway 180. He got out of his pickup, saw what appeared to be a body part, and went to the Skinny's parking lot to get out of the highway and to throw up. McCullough never went to go check on the driver of the other car because he was in shock. Although McCullough refused to be transported to the hospital by ambulance, he did go to the hospital with his wife to do a voluntary blood draw.

McCullough testified that he had not consumed any alcoholic beverages that day, nor had he used or taken any legal or illegal drugs. He smoked cigarettes when he drove, but was not sure if he was smoking at the time of the accident. The beer box and beer bottles found on the road after the collision did not come from his pickup. McCullough believed that the cause of the wreck was appellant trying to beat him across the highway to get to FM 3099; he was "trying to shoot the gap." When asked if he knew for sure that was what happened, he responded, "No, ma'am, I do not." McCullough gave a written statement to the police regarding the accident,

4

which was admitted into evidence. He was asked during cross-examination to read the following portion to the jury: "As I approached the Skinny's across from Wal-Mart, I glanced over in the parking lot. When I looked up there was a little blue car right there. As soon as I seen the car, we collided." McCullough was asked if he accidentally led to Angel's death to which he responded, "Accidentally, yes, I guess I did."

David Easley, Captain of the Breckenridge Fire Department, testified that he was dispatched to a motor vehicle accident at approximately 4:30 p.m. When Captain Easley arrived on the scene, appellant was still in the driver's seat of the Kia. The front seat passenger, Armando, was already out of the car. Captain Easley stuck his head into the car to speak with appellant and could smell alcohol in the car; however, Captain Easley did not know whether alcohol was on the appellant's breath. The smell was very noticeable. Appellant told Captain Easley that he had been fishing at the rocks. Captain Easley observed that appellant had a cut on his head and was disoriented. He observed one or two beer bottles on the floorboard and a cooler and a twelve-pack of bottled beer lying in the road. As to whether alcohol could have been a factor in the accident, Captain Easley testified, "You know, the accident was a judgment call and, you know, alcohol can affect judgment."

While Captain Easley was talking with appellant, he was alerted that one of the other firemen could not get a pulse on the passenger in the backseat. Captain Easley went around to the right rear passenger seat to try and get a pulse, but was unsuccessful. Angel was pronounced dead on the scene. Angel's right arm and right leg were found in the highway. One of his fingers was also found in the bumper of the Dodge pickup. Armando and appellant were transported to the hospital by ambulance. Captain Easley had no contact with the driver of the Dodge pickup.

Captain Easley testified that there had been many accidents resulting in injuries at the intersection of Highway 180 and FM 3099. He believed that there should be a light at the intersection or that the speed limit should be reduced. He had approached the city about his concerns. Captain Easley agreed that there was a gradual incline on Highway 180 traveling westbound out of town and agreed that it was possible that a person driving a vehicle eastbound on Highway 180 uphill and into town would not have a clear view of someone turning left onto FM 3099 from Highway 180 until the person was almost to the intersection. Captain Easley testified that he did not believe a crime happened but, rather, that bad judgment happened.

Dr. Marc Krouse, the Chief Deputy Medical Examiner of Tarrant County, testified that Angel's cause of death was massive blunt force trauma to the head, chest, abdomen, pelvis, and extremities as a result of a motor vehicle collision. He described the injuries as the type that you would see if a person fell seventy to ninety feet onto concrete.

Officer Bruce Hay, with the Breckenridge Police Department, testified that he was the lead officer in the case. When he arrived, Armando was kneeling down behind the Kia. Several people were around him and trying to help him because he was bleeding. Officer Hay went around to the driver's side of the vehicle and spoke with appellant. Appellant was trapped in the driver's seat and was unsure of where he was or what had happened. Officer Hay smelled the odor of an alcoholic beverage. He did not perform any field sobriety tests on appellant because appellant had been involved in a major car accident and because it was unknown what type of injuries he had. Officer Hay saw some empty beer bottles inside the vehicle as well as a bottle lying on the ground next to the right front passenger door. He testified that it was possible that the smell of alcohol came from the two bottles found on the passenger side of the car. The passenger in the backseat was not moving, and Officer Hay determined that he was deceased.

Officer Hay and Police Chief Larry Mahan took photos of the scene. When Officer Hay left the scene, he went to the hospital and took possession of the two blood draws that were collected from appellant and McCullough. He took the blood draws to the Breckenridge Police Department and placed them into evidence. On the following Monday, he released the blood samples to Chief Mahan so that Chief Mahan could take the samples to the Tarrant County Medical Examiner's office to be analyzed. When the Breckenridge Police Department personnel received the results from the Tarrant County Medical Examiner's office, they filed a case report with the Breckenridge district attorney in which they alleged that appellant had committed intoxication manslaughter.

Officer Hay went back to the scene on June 26th to assist Sergeant David Foster, with the Texas Department of Public Safety, in taking laser measurements. Officer Hay testified that, based on his training and his observations at the scene, the wreck was caused because the blue Kia failed to yield the right-of-way to the Dodge pickup. He did not know for sure which direction the Kia was traveling prior to the accident, but could not think of any scenario where the accident would have occurred in the manner that it did if appellant had not failed to yield. There was no evidence of appellant weaving or speeding up and slowing down prior to the

6

accident. Officer Hay agreed that there was a slight incline on Highway 180 west of the FM 3099 intersection and that there was possibly a blocked view of the approaching FM 3099 intersection as one travels up the incline.

Officer Hay acknowledged that he made mistakes in his investigation of this case. He took a statement from McCullough but never talked to appellant after he left the accident scene. He attempted to make contact with Armando but was unable to do so. Officer Hay included one witness in his incident report, which was the only witness that he was made aware of; however, he never spoke with her during his investigation of the accident. He did not write down anyone's name or telephone number out of the possibly fifty people that came out to the scene. Officer Hay did not inventory the Kia for any evidence of intoxication, nor did he inventory the cooler found on the highway.

Ronnie Cagle, the administrative laboratory director at Stephens Memorial Hospital, testified that appellant's blood alcohol concentration was 0.101, two hundredths of a point greater than the legal limit. McCullough's blood alcohol concentration was 0.002, which did not necessarily mean that he had any alcohol in his system.

Bob Browder, a senior forensic scientist with the Texas Department of Public Safety, testified that, if a person is legally intoxicated—having an alcohol concentration higher than the statutory limit of .08—that person does not have the normal use of his mental or physical faculties in order to safely operate a motor vehicle. Browder testified that alcohol impairs judgment, increases risk taking, affects a person's ability to judge distances, affects a person's vision, slows down a person's reactions, and affects how a person processes information coming into the person's eyes and ears. As to his opinion on what appellant's blood alcohol concentration was at the time of the accident, Browder testified that the level would have been the same, higher, or lower than the level at the time of the blood draw depending on his height and weight and the type and amount of alcohol and food consumed. Because he did not have that information, he could not make a determination in this case as to what appellant's blood alcohol level was at the time of the accident. The blood sample, in which appellant's blood alcohol concentration was 0.101, was drawn approximately forty-five minutes to one hour after the accident. Appellant's blood alcohol concentration was lower when a subsequent vial of blood was drawn and tested.

Sergeant David Foster, with the Texas Department of Public Safety, was a member of the district's crash reconstruction team in June 2008. He went to the accident scene on June 26 to do a diagram of the scene with a "Total Station." Sergeant Foster testified that he would have listed intoxication as the primary factor of the accident because intoxication was the cause of the crash. He also would have listed failure to yield right-of-way as a factor. Sergeant Foster was familiar with the intersection, and despite the incline on Highway 180, there were no visibility problems. Based on his training and experience, he believed that appellant's intoxication, failure to yield right-of-way, and turning in front of the Dodge pickup caused Angel's death. He also believed that, based on the legal definition of "deadly weapon," the blue Kia was used as a deadly weapon. He did not believe that McCullough was speeding and testified that speed was not a factor in this collision.

Trooper Richard Grant Atkinson, with the Texas Department of Public Safety, was also a member of the district's crash reconstruction team in June 2008. He went to the scene on June 20, the day of the accident, to mark the skid marks and physical evidence left on the roadway. Trooper Atkinson later went back to the accident scene and determined that there were no visibility restrictions at the intersection either traveling eastbound up the incline on Highway 180 or traveling westbound looking down the incline on Highway 180. Trooper Atkinson testified that, in his opinion, the accident was due to appellant's impaired judgment caused by intoxication and appellant's failure to yield the right-of-way in making a turn.

Kyle Morrison testified that he had seen a white pickup speeding on Highway 180 on several occasions, but he was unsure as to whether the white pickup he saw was the same pickup that was involved in the accident on June 20. He was concerned about the speeding pickup and made a complaint to the Breckenridge Police Department a couple of weeks before the accident.

In his first issue, appellant argues that there was no evidence of intoxication at the time of the accident. Appellant testified that he had three beers on the day of the accident. One before he started the tattoo, and two during the tattoo. Approximately forty-five minutes to one hour after the accident, appellant's blood was drawn and tested. Appellant's blood alcohol level was 0.101, greater than the 0.08 legal limit. Although Browder testified that he could not determine what appellant's blood alcohol level was at the time of the accident, the members of the jury were entitled to make any reasonable inferences, including that appellant's blood alcohol concentration was the same or higher at the time of the accident. In addition, Captain Easley and

8

Officer Hay testified that they could smell alcohol in the Kia when they leaned in to talk to appellant while he was trapped in the driver's seat. Having reviewed the evidence in the light most favorable to the verdict, we hold that any rational trier of fact could have found beyond a reasonable doubt that appellant was intoxicated at the time of the accident. We overrule appellant's first issue.

Appellant asserts in his second issue that there was insufficient evidence of a causal connection between his intoxication and Angel's death. In order to prove that a person committed the offense of intoxication manslaughter, it is not enough to prove that the operation of a vehicle by an intoxicated person caused the death of an individual. Rather, the State must prove that the intoxication caused the death. *Daniel v. State*, 577 S.W.2d 231, 233 (Tex. Crim. App. 1979) (quoting *Long v. State*, 214 S.W.2d 303, 304 (Tex. Crim. App. 1948)). "The death must be the result of the intoxication and proof must be made and submitted to the jury of that thing which worked a causal connection between the intoxication and the death." *Id.* Here, Trooper Atkinson testified that, in his opinion, the accident was due to appellant's impaired judgment caused by intoxication in which he failed to yield the right-of-way in making a turn. Sergeant Foster testified that he believed appellant's intoxication, failure to yield the right-of-way, and turning in front of the Dodge pickup caused Angel's death. In addition, Browder testified that, if a person has an alcohol concentration higher than the legal limit of 0.08, that person does not have the normal use of his mental or physical faculties in order to safely operate a motor vehicle because alcohol impairs judgment, affects a person's ability to judge distances, and affects how a person processes information coming into the person's eyes and ears. Having reviewed the evidence in the light most favorable to the verdict, we hold that any rational trier of fact could have found beyond a reasonable doubt that appellant's intoxication caused Angel's death. We overrule appellant's second issue.

In his third and fourth issues, appellant challenges the sufficiency of the evidence to support the deadly weapon finding. Specifically, appellant asserts that there was no evidence of how the car was driven prior to the accident and, thus, that there was no evidence appellant used the car as a deadly weapon. A vehicle is not a deadly weapon per se, but can be found to be a deadly weapon if it is used in a manner that is capable of causing death or serious bodily injury. *See* Section 1.07(a)(17)(B). To determine whether a motor vehicle was used as a deadly weapon, we first evaluate the manner in which appellant used the vehicle. *Sierra v. State*, 280 S.W.3d

250, 255 (Tex. Crim. App. 2009). Two of the factors we consider in this determination are whether there was evidence that appellant was driving dangerously or recklessly. *Id.* Second, we evaluate whether the vehicle was capable of causing death or serious bodily injury. *Id.*

Here, the evidence showed that appellant was intoxicated, failed to yield the right-of-way, and turned in front of McCullough's pickup, which was traveling fifty miles per hour down the highway. Thus, there was sufficient evidence that appellant was driving his car in a dangerous or reckless manner. As to whether the vehicle was capable of causing death or serious bodily injury, the evidence showed that not only was the vehicle capable of causing death but that it did in fact cause Angel's death. Therefore, there was sufficient evidence that the vehicle was capable of causing death or serious bodily injury. Furthermore, Sergeant Foster specifically testified that he believed the blue Kia was used as a deadly weapon. Having reviewed the evidence in the light most favorable to the verdict, we hold that any rational trier of fact could have found beyond a reasonable doubt that appellant used his blue Kia in a manner capable of causing death or serious bodily injury and, thus, used his blue Kia as a deadly weapon. We overrule appellant's third and fourth issues.

The judgment of the trial court is affirmed.


JIM R. WRIGHT
CHIEF JUSTICE


May 3, 2012

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Kalenak, J.

10